UNITED STATES of America,
Plaintiff–Appellee,

v.

Stephen Wayne ATCHESON,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Mark Edward McGRATH,
Defendant–Appellant.

Nos. 95–30296, 95–30297.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 5, 1996.

Decided Aug. 30, 1996.

As Amended on Denial of Rehearing
Oct. 3, 1996.

Steven V. Richert, Service, Gasser & Kerl, Pocatello, Idaho, for defendant-appellant Atcheson. Monte R. Whittier, Whittier, Souza & Naftz, Pocatello, Idaho, for defendant-appellant McGrath.

James M. Peters, Assistant United States Attorney, Boise, Idaho, for plaintiff-appellee.

Before ALARCON, NORRIS and KLEINFELD, Circuit Judges.

ALARCON, Circuit Judge:

Mark Edward McGrath and Stephen Wayne Atcheson were found guilty of conspiracy to commit robbery, attempted robbery, extortion, and attempted extortion in violation of the Hobbs Act. The jury also found McGrath and Atcheson guilty of violating the Travel Act, using a firearm during a crime of violence, possessing an unregistered firearm, and being felons in possession of firearms.

McGrath seeks reversal of the judgment of conviction on the following grounds:

One. The district court lacked subject matter jurisdiction under the Hobbs Act, 18 U.S.C. § 1951(a).

Two. The district court erroneously instructed the jury that the defendants could be found guilty of violating the Hobbs Act if

their acts had a probable or potential effect on commerce.

Three. The district court erroneously imposed consecutive sentences for the Hobbs Act violations and firearms violations.

Atcheson joins McGrath in his first and third contentions. He also seeks reversal of the judgment of conviction on the following grounds:

One. The district court erred in denying his motion for a separate trial and his motion for mistrial.

Two. The prosecution improperly vouched for the credibility of government witnesses and referred to evidence not in the record during closing argument.

Three. The pretrial identification procedure was impermissibly tainted.

Four. The district court erroneously imposed consecutive sentences for the use of two firearms during the crimes.

For the reasons stated below we remand to the district court for the purpose of resentencing Atcheson on counts 11 and 12 for violation of 18 U.S.C. § 924(c). We affirm the remainder of the judgment.

## I.

McGrath, Atcheson, and an unindicted co-conspirator, Teddy Pinkerton, formulated a scheme to make some "easy money" by taking hostages, stealing their credit and automated teller machine ("ATM") cards, and then using the cards to obtain money through ATM machines. To implement this plan they traveled from their homes in Salt Lake City, Utah to Pocatello, Idaho on July 28, 1994. Once in Pocatello, McGrath, using the alias of Jerry Timberman, posed as a prospective buyer for a vacant building. McGrath contacted various business men and women in the Pocatello area, ostensibly for the purpose of obtaining bids and estimates on the cost of remodeling the building and supplying office equipment. He arranged to meet with these persons at the vacant building the next day.

As the individuals contacted by McGrath arrived for their appointments on July 29, 1994, the co-conspirators took them hostage, using a sawed-off shotgun and a .22 caliber semi-automatic pistol. The co-conspirators took the hostages' wallets, credit cards, ATM cards, cash, jewelry and other personal items, and demanded their personal identification numbers for their credit and ATM cards. The hostages were ordered to remove their clothing and to crawl into a vault where their feet and hands were bound with duct tape. Throughout this ordeal, the co-conspirators threatened to kill the hostages or to injure their families.

Many of the credit and ATM cards which the co-conspirators took from the hostages were from out-of-state financial institutions. After taking the credit and ATM cards, the co-conspirators called the financial institutions, apparently to check the bank account balances and credit limits associated with the cards. The co-conspirators attempted to obtain money with the credit and ATM cards. Their efforts proved fruitless.

On May 11, 1995, the Government filed a fifteen count superseding indictment against McGrath and Atcheson in the United States District Court for the District of Idaho. On June 7, 1995, a jury convicted McGrath and Atcheson of the following crimes: count 1, conspiracy to violate the Hobbs Act; count 2, violation of the Interstate and Foreign Travel Act; counts 3–10, violation of the Hobbs Act in relation to each of eight victims; counts 11 and 12, use of a firearm during and in relation to a crime of violence; count 13, possession of an unregistered firearm; and counts 14–15, being a felon in possession of a firearm. McGrath and Atcheson were sentenced on August 31, 1995. They timely appealed the judgment of conviction and the sentence imposed by the district court.

## II.

McGrath and Atcheson contend that the district court lacked jurisdiction under the Hobbs Act because the Government did not demonstrate a sufficient connection between their acts and interstate commerce. The elements of a Hobbs Act violation are extortion and a nexus between a defendant's acts and interstate commerce. *Stirone v. United States*, 361 U.S. 212, 218, 80 S.Ct.

270, 273–74, 4 L.Ed.2d 252 (1960). Because the Government bears the burden of proving each element of the crime, McGrath and Atcheson were not required to challenge the sufficiency of the Government's evidence of a nexus between their acts and interstate commerce before the trial court. *See United States v. James*, 987 F.2d 648, 651–52 (9th Cir.1993) (bank robbery conviction reversed where government failed to present any evidence that bank was insured by the FDIC). This court must reverse the conviction if, reviewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found that there was a sufficient nexus between McGrath and Atcheson's acts and interstate commerce. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

### A.

■ We have held that the Government need prove that a defendant's acts had only a *de minimis* effect on interstate commerce to support a Hobbs Act violation. *United States v. Phillips*, 577 F.2d 495, 501 (9th Cir.), *cert. denied*, 439 U.S. 831, 99 S.Ct. 107, 58 L.Ed.2d 125 (1978); *United States v. Zemek*, 634 F.2d 1159, 1173 n. 20 (9th Cir. 1980), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3031, 69 L.Ed.2d 406 (1981). McGrath and Atcheson contend that the United States Supreme Court overruled our *de minimis* standard in *United States v. Lopez*, — U.S. —, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). We disagree.

In *Lopez*, the Supreme Court addressed a challenge to Congress' authority under the Commerce Clause to enact the Gun–Free School Zones Act, 18 U.S.C. § 922(q)(1)(A). — U.S. at —, 115 S.Ct. at 1626. The Court recognized three broad categories of activity that Congress may regulate pursuant to its commerce power: (1) use of channels of interstate commerce; (2) instrumentalities of interstate commerce; and (3) activities having a substantial relation to interstate commerce. *Id.* at — – —, 115 S.Ct. at 1629–30. The Court concluded that the Gun–Free School Zones Act did not involve the first two categories. *Id.* at —, 115 S.Ct. at 1630. Addressing the third cate-

gory, the Court opined that it was unclear from current case law whether the regulated activity must simply "affect" interstate commerce or whether it must "substantially affect" interstate commerce. *Id.* The Court concluded that the proper test for a statute which "neither regulates a commercial activity nor contains a [jurisdictional] requirement that the [regulated activity] be connected in any way to interstate commerce" was whether the regulated activity "substantially affects" interstate commerce. *Id.* at —, —, 115 S.Ct. at 1626, 1630. With respect to the Gun–Free School Zones Act, the Court concluded that "[t]he possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Id.* at —, 115 S.Ct. at 1634. Accordingly, the Court held that the Gun–Free School Zones Act was an invalid exercise of Congressional authority under the Commerce Clause. *Id.* at —, 115 S.Ct. at 1626.

We have not previously addressed the question whether the Court's decision in *Lopez* invalidates the law of this circuit that the Government need only show a *de minimis* effect on interstate commerce to support a violation of the Hobbs Act. *See Phillips*, 577 F.2d at 501 (applying *de minimis* standard); *Zemek*, 634 F.2d at 1173 n. 20 (same). Several other courts, however, have rejected similar challenges to their application of a *de minimis* test under the Hobbs Act. *United States v. Stillo*, 57 F.3d 553 (7th Cir.), *cert. denied*, — U.S. —, 116 S.Ct. 383, 133 L.Ed.2d 306 (1995); *United States v. Bolton*, 68 F.3d 396 (10th Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 966, 133 L.Ed.2d 887 (1996); *see also, United States v. Farmer*, 73 F.3d 836, 843 (8th Cir.) (holding that *Lopez* had "no application to [Hobbs Act] cases [involving robbery] of commercial establishments"), *cert. denied*, — U.S. —, 116 S.Ct. 2570, 135 L.Ed.2d 1086 (1996).

In *United States v. Bolton*, the defendant argued that the Supreme Court's decision in *Lopez* invalidated both the Hobbs Act and the Tenth Circuit's *de minimis* test. 68 F.3d at 398. The Tenth Circuit rejected both

arguments. *Id.* at 399. The court opined that:

> *Lopez* did not ... require the government to show that *individual* instances of the regulated activity substantially affect commerce to pass constitutional muster under the Commerce Clause. Rather, the Court recognized that if a statute regulates an activity which, through repetition, in aggregate has a substantial affect on interstate commerce, 'the *de minimis* character of individual instances arising under that statute is of no consequence.'

*Id.* (internal cites omitted) (emphasis in original).

In *United States v. Stillo,* the Seventh Circuit concluded that its *de minimis* test was consistent with *Lopez.* 57 F.3d at 558 n. 2. The *Stillo* court reasoned that unlike the Gun–Free School Zones Act, the Hobbs Act is aimed at a particular type of economic activity, and contains an express jurisdictional requirement that the regulated activity affect interstate commerce. *Id.* Accordingly, the court held that *Lopez's* "substantially affects" test did not apply to individual violations of the Hobbs Act. *Id.*

In a case decided shortly after *Lopez,* the Supreme Court recognized that the "substantially affects" test which it applied in *Lopez* was developed "to define the extent of Congress's power over purely *intra* state commercial activities that nonetheless have substantial *inter* state effects." *United States v. Robertson,* —— U.S. ——, ——, 115 S.Ct. 1732, 1733, 131 L.Ed.2d 714 (1995) (emphasis in original). In contrast to the Gun–Free School Zones Act, which was aimed at purely local, noneconomic activities, the Hobbs Act is directly aimed at economic activities which "in any way or degree ... affects commerce." 18 U.S.C. § 1951(a). The Hobbs Act defines commerce as "all commerce between any point in a State ... and any point outside thereof; all commerce between points within the same State through any place outside such State." 18 U.S.C. § 1951(b)(3). Because the Hobbs Act is con-

cerned solely with *inter* state, rather than *intra* state, activities, we conclude that *Lopez's* "substantially affects" test is not applicable.

McGrath and Atcheson also argue that our decision in *United States v. Pappadopoulos* requires the Government to demonstrate that their acts had a substantial effect on interstate commerce. 64 F.3d 522 (9th Cir. 1995). The defendant in *Pappadopoulos* was convicted under 18 U.S.C. § 844(i) in connection with an arson that resulted in the burning of her personal residence.[1] *Id.* at 524. In that case, we summarized the Court's holding in *Lopez* as follows:

> where Congress seeks to regulate a purely *intrastate noncommercial* activity that has traditionally been subject to exclusive regulation by state or local government, and where the connection of the regulated activity as a whole to interstate commerce is neither readily apparent nor illuminated by express congressional findings, the government must satisfy the jurisdictional requirement by pointing to a 'substantial' effect on or connection to interstate commerce.

*Id.* at 527 (emphasis added). In *Pappadopoulos,* we concluded that the residence that was burned was "purely private and was not 'engaged in' or 'used in' interstate commercial activity." *Id.* at 526. Here, the Government demonstrated that the activities engaged in by McGrath and Atcheson had a direct impact on interstate commerce. The statute in *Pappadopoulos* speaks to destroying by fire a building "used in interstate or foreign commerce," while the Hobbs Act speaks to one who "affects commerce" by robbery or extortion. The statute construed in *Pappadopoulos* did not require that the crime itself "affects commerce," so we construed the requirement of an indirect effect through the building destroyed to imply substantiality. Where the crime itself directly affects interstate commerce, as in the Hobbs Act, no requirement of a substantial effect is

---

1. Section 844(i) provides in relevant part: [w]hoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned ...

necessary to empower Congress to regulate the activity under the Commerce Clause.

### B.

McGrath and Atcheson argue that their actions did not have a sufficient effect on interstate commerce to support their conviction under the Hobbs Act. Count 1 of the indictment alleges that McGrath and Atcheson conspired to take the eight victims hostage and to rob them of anything of value on their persons, including bank cards. Counts 3–10 allege that McGrath and Atcheson committed robbery, extortion, and attempted extortion with respect to each individual victim. To support McGrath and Atcheson's conviction of conspiracy, the Government need only show that the totality of their actions had a *de minimis* effect on interstate commerce. To support McGrath and Atcheson's conviction under each of counts 3–10, the Government must demonstrate that their acts had a *de minimis* effect on interstate commerce with respect to each victim.

The Government asserts that it established a sufficient nexus between the perpetrators' actions and interstate commerce with respect to each victim by at least one of the following: (1) the theft of the victims' out-of-state credit cards; (2) the placement of interstate telephone calls to acquire information regarding the victims' bank accounts; or (3) the depletion of assets.

■ To establish a *de minimis* effect on interstate commerce, the Government need not show that a defendant's acts actually affected interstate commerce. *United States v. Huynh*, 60 F.3d 1386, 1389 (9th Cir.1995). Rather, the jurisdictional requirement is satisfied "by proof of a probable or potential impact." *Id.* This court has consistently upheld convictions under the Hobbs Act

> even where the connection to interstate commerce was slight. *See, e.g., [United States v. Pascucci*, 943 F.2d 1032, 1035 (9th Cir.1991) ] (defendant threatened to deliver embarrassing audio tapes to his victim's employer, a corporation engaged in interstate commerce); *United States v. Hanigan*, 681 F.2d 1127, 1130–31 (9th Cir. 1982) (defendant robbed three undocumented alien farm workers, affecting the

movement of labor across borders); *United States v. Phillips*, 577 F.2d 495, 501 (9th Cir.1978) (defendant's extortion 'threatened the depletion of resources from a business engaged in interstate commerce').

*Huynh*, 60 F.3d at 1389.

■ The evidence before the district court establishes that McGrath and Atcheson attempted to obtain, or obtained, out-of-state credit or ATM cards from each of the victims except Deanna Rosen. These acts created a sufficient potential effect on interstate commerce to support their convictions under the Hobbs Act. *See United States v. Rushdan*, 870 F.2d 1509, 1512 (9th Cir.1989) (conspiracy to possess out-of-state bank cards illegally, and illicit possession of out-of-state bank cards, are offenses which affect interstate or foreign commerce for purposes of 18 U.S.C. § 1029(a)(3)). McGrath and Atcheson's placement of out-of-state phone calls to determine the victims' account balances and credit card limits created a further connection with interstate commerce. *United States v. Lee*, 818 F.2d 302, 305–06 (4th Cir.1987) (interstate telephone call by a bank manager triggered by defendant's attempt to use credit card was sufficient to establish interstate commerce under 18 U.S.C. § 1029).

■ The Government established a sufficient nexus between the crimes against Deanna Rosen and interstate commerce in two ways. First, the criminals extorted from Mrs. Rosen information about how much money the Rosens had in their accounts in banks, one of which was headquartered in another state, and then used this information in their attempts to force Mr. Rosen to withdraw it and give it to them. Second, they took the jewelry they robbed from Mrs. Rosen across state lines to fence. Thus the crimes against her directly affected interstate commerce.

### C.

McGrath asserts that the district court erred in instructing the jury that he could be found guilty of violating the Hobbs Act if his acts had a probable or potential effect on commerce. "[W]hether a jury instruction

misstates the elements that must be proved at trial is a question of law that is reviewed *de novo.*" *Caballero v. Concord,* 956 F.2d 204, 206 (9th Cir.1992). As discussed above, the Government need only prove that McGrath's actions had a probable or potential effect on interstate commerce to support his conviction under the Hobbs Act. *Phillips,* 577 F.2d at 501. Accordingly, we hold that the district court correctly instructed the jury regarding this element.

### III.

Atcheson contends that the district court erred in denying his motion for a separate trial following McGrath's decision to defend himself *pro se.* We review a district court's decision whether to sever a trial for an abuse of discretion. *United States v. Ponce,* 51 F.3d 820, 831 (9th Cir.1995). "The test for abuse of discretion by the district court is whether a joint trial was so manifestly prejudicial as to require the trial judge to exercise his discretion in but one way, by ordering a separate trial." *United States v. Baker,* 10 F.3d 1374, 1387 (9th Cir.1993) (internal quotation omitted), *cert. denied,* —— U.S. ——, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994).

Atcheson has demonstrated no manifest and unfair prejudice on account of the denial of a severance. He argues that McGrath's defense efforts were so ineffectual as to increase the probability that the jury would convict. But McGrath's defense tended to incriminate himself, not Atcheson.

### IV.

Atcheson asserts that the prosecution "personally vouched for the credibility of witnesses, injected non-testimonial issues . . . and improperly commented on [his] right to remain silent" during closing argument. To prevail on a motion for new trial based on prosecutorial misconduct, a defendant must show that the conduct more probably than not materially affected the fairness of the trial. *United States v. Smith,* 893 F.2d 1573, 1583 (9th Cir.1990). We ordinarily review for abuse of discretion the district court's denial of a motion for new trial based on

prosecutorial misconduct. *U.S. v. Meling,* 47 F.3d 1546, 1556 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 130, 133 L.Ed.2d 79 (1995). However, when the defense does not object to the prosecutor's conduct during trial, we review for plain error. *United States v. Young,* 470 U.S. 1, 14–16, 105 S.Ct. 1038, 1045–47, 84 L.Ed.2d 1 (1985).

### A.

The only allegation of misconduct which Atcheson objected to during trial is that the prosecutor argued outside the record when referring to Atcheson's failure to deny his involvement in the crime to his cousin, Jeff Ettleman. Ettleman testified that he read to Atcheson a newspaper article naming him as one of the perpetrators of the crime. Ettleman further testified that Atcheson interrupted him as he read the first names of the other suspects and that Atcheson supplied the last names of the suspects. The Government, in referring to this testimony, argued as follows: "But what's more important about Ettleman's testimony is what Atcheson didn't say to him. Atcheson didn't say, 'Are you kidding me? They got me charged with a crime that serious?' And 'I didn't do it.'"

We will grant a new trial only where the prosecutor's statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (internal quotation omitted). Examples of prosecutorial misconduct include manipulating and misstating the evidence. *Id.* at 182–83, 106 S.Ct. at 2472. It is not misconduct for the prosecutor to argue reasonable inferences based on the record. *United States v. Necoechea,* 986 F.2d 1273, 1279 (9th Cir.1993).

We conclude that it was reasonable for the prosecutor to infer from Ettleman's testimony that Atcheson did not deny his involvement in the crime to his cousin. *See United States v. Giese,* 597 F.2d 1170, 1196 (9th Cir.) ("[i]n a noncustodial atmosphere prior to indictment, most people would deny accusations of having participated in federal offenses"), *cert. denied,* 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979). According-

ly, the prosecutor's comment regarding Atcheson's failure to deny the crime does not warrant a new trial.

## B.

Because Atcheson did not raise his remaining contentions at trial, we review them for plain error. *Young*, 470 U.S. at 14–16, 105 S.Ct. at 1045–47. We will reverse for plain error "solely in those circumstances in which a miscarriage of justice would otherwise result." *Id.* at 15, 105 S.Ct. at 1046 (citation omitted).

Atcheson claims that the prosecutor improperly vouched for witnesses Pinkerton and Flowers. "Improper vouching occurs when the prosecutor places the prestige of the government behind the witness by providing personal assurances of the witness's veracity." *United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir.1992) (internal quotes omitted).

In response to defense counsels' attack of the credibility of Pinkerton and Flowers in their closing arguments, the prosecutor argued "but if you will recall their testimony when they were on the stand, they were good witnesses." This statement does not imply that the Government was assuring the veracity of Flowers and Pinkerton, nor does it reflect the prosecutor's personal beliefs. Rather, the prosecutor was merely arguing that it could be inferred from the record that Flowers and Pinkerton were good witnesses. *Compare Necoechea*, 986 F.2d at 1279 (not improper vouching where prosecutor stated "why, ladies and gentlemen, if [the witness] is lying, isn't she doing a better job of it? I submit to you, ladies and gentlemen, that she's not lying. I submit to you that she's telling the truth") with *Kerr*, 981 F.2d at 1053 (improper vouching where prosecutor stated "I think he was very candid," and "I think he was honest").

Atcheson also contends that the prosecutor improperly vouched for Seeley's credibility when the prosecutor argued that "I think his identification is a good identification." The Government concedes that this statement is impermissible vouching. We conclude, however, that the statement did not

result in a miscarriage of justice because there was ample other evidence linking Atcheson to the crime, including identifications by four other witnesses.

Atcheson asserts that the prosecutor impermissibly argued evidence not in the record when it explained why one of the victim witnesses was not requested to view the in-person lineup. During closing argument, the prosecutor told the jury "[y]ou have to understand what we were trying to avoid, we were trying to avoid situations where we reinforced his identification." At trial, police testified that they did not invite Rosenbaum to the lineup because he had already identified Atcheson from a previous photo array. The police also testified that they decided it was better not to have Rosenbaum make an actual identification at the lineup. The prosecutor's argument was a permissible inference from this testimony, and thus did not result in a miscarriage of justice.

Atcheson argues that the prosecutor impermissibly referred to Flowers as the fourth conspirator, "despite the trial court's consistent refusal to allow Mr. Flowers to be so labeled." During closing argument, the prosecution stated "Mark Flowers, the guy who testified that he was the fourth conspirator." Flowers testified at trial that he discussed carrying out the Idaho plan with Atcheson and McGrath, but that he withdrew from the plan at the last minute because of trouble with his parole officer. Flowers also testified that he and Atcheson purchased and altered the shotgun that was used by Atcheson and McGrath in the crime. Finally, Flowers testified that he aided McGrath in disposing of gold and diamonds which were part of the fruits of the crime. Because the record contained ample testimony from which the jury could infer that Flowers was a co-conspirator, the prosecutor's statement did not result in a miscarriage of justice.

Finally, Atcheson asserts that the prosecution erroneously stated that he had "lied." In closing the prosecutor argued:

> But Mr. Wahl's testimony that McGrath was the one that bought the shotgun, and perhaps he is, nobody was down there with

the exception of McGrath, Atcheson and Flowers, and Atcheson and McGrath lied.

Atcheson contends that this comment impermissibly called attention to his failure to testify. The Government concedes that this comment was improper because Atcheson did not testify and there was no other evidence that he had lied. However, the Government argues that the comment was an "unintentional verbal mishap" that did not amount to plain error.

■■■ It is well established that a prosecutor may not comment on a defendant's failure to testify. *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965). "The test is whether the comment is manifestly intended to call attention to the defendant's failure to testify, and is ... of such a character that the jury would naturally and necessarily take to be a comment on the failure to testify." *United States v. Castillo,* 866 F.2d 1071, 1083 (9th Cir.1988) (internal quotes omitted). There is no evidence that the prosecutor's statement that Atcheson and McGrath lied was intended to call attention to their failure to testify, nor is the statement such that the jury would naturally view it as a comment on a defendant's failure to testify. Accordingly, we conclude that the comment did not result in a miscarriage of justice.

### V.

■■■ Atcheson contends that the in-person lineup in which he was identified by three witnesses was impermissibly tainted. We normally review the constitutionality of pretrial identification procedures *de novo. United States v. Simoy,* 998 F.2d 751, 752 (9th Cir.1993). However, where the defendant fails to object to the admission of the identification by way of a pretrial suppression motion, he waives his right to challenge the identifications absent a showing of cause and prejudice. *Doganiere v. United States,* 914 F.2d 165, 167 (9th Cir.1990), *cert. denied,* 499 U.S. 940, 111 S.Ct. 1398, 113 L.Ed.2d 454 (1991).

■■■ Atcheson has not offered any reason for his failure to challenge the lineup in a pretrial suppression motion. Although Atcheson filed a pre-trial motion to suppress the identifications, he withdrew this motion at the time of the hearing.

Likewise, Atcheson has failed to show that he was prejudiced by the pretrial identifications. There was ample other evidence supporting his conviction. *See Doganiere,* 914 F.2d at 168 (defendant failed to show prejudice from attorney's failure to suppress line-up identifications where there was substantial other evidence linking him to the crime). Two other witnesses, co-conspirator Pinkerton and victim Rosenbaum, directly identified Atcheson as a participant in the crime. The jury also had evidence of Atcheson's flight to Georgia and evidence that he remained a fugitive, living under assumed names, for approximately six months after his cousin Jeff Ettleman told him he was wanted for this crime.

### VI.

#### A.

McGrath and Atcheson contend that the district court erred in imposing consecutive sentences for the Hobbs Act and firearms violations. They argue that because the Hobbs Act requires acts or threats of physical violence, and because the sentencing guidelines provide enhancements for the use of firearms during a Hobbs Act violation, further enhancement under 18 U.S.C. § 924(c) constitutes double jeopardy. We review the district court's construction and interpretation of the United States Sentencing Guidelines *de novo. United States v. Gavilan,* 966 F.2d 530, 531 (9th Cir.1992).

This argument is without merit. We have made it clear that sentences for multiple convictions under § 924(c) must run consecutively to each other as well as to "any other term of imprisonment." *United States v. Neal,* 976 F.2d 601, 602–03 (9th Cir.1992) (quoting 18 U.S.C. § 924(c)(1)); *see also, United States v. Blocker,* 802 F.2d 1102, 1104 (9th Cir.1986) (holding that § 924(c) was amended to ensure that persons who commit federal crimes of violence receive a mandatory sentence without the possibility of the sentence being made to run concurrently with that for the underlying offense). Like-

wise, the commentary to Section 2K2.4 of the sentencing guidelines states that a term of imprisonment under § 924(c) must "run consecutively to any other term of imprisonment."

▮ The imposition of consecutive sentences under the Hobbs Act and § 924(c) does not violate the double jeopardy clause. "[T]he test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). A Hobbs Act conviction requires proof of threats or force but not proof that the defendant possessed a weapon. A conviction under § 924(c) requires proof that the defendant used or carried a weapon but not that the weapon was actually used for threat or force. *See United States v. Parker,* 73 F.3d 48, 55 (5th Cir.1996) (holding that consecutive sentences for violation of the Hobbs Act and § 924(c) did not violate the double jeopardy clause).

### B.

Atcheson also argues that the district court erred in imposing consecutive terms for two § 924(c) violations based on the same underlying offenses. The Government conceded at oral argument that under *United States v. Smith,* 924 F.2d 889, 894 (9th Cir.1991), each § 924(c) charge must be tied to a separate predicate offense. Accordingly, we remand to the district court for the purpose of resentencing Atcheson and McGrath on counts 11 & 12.

REMANDED in part, AFFIRMED in part.